# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MIRANDA K. COYLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-12-179-FHS-SPS |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

The claimant Miranda K. Coyle requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On February 14, 2013, Carolyn Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799,

---

[2] Step One requires the claimant to establish that she is not engaged in substantial gainful activity. Step Two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If hse *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is deemed disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born July 27, 1980, and was twenty-nine years old at the time of the second administrative hearing (Tr. 70, 240). She earned an associate's degree in veterinary technology and has past relevant work as a grocery sacker, lab assistant, and veterinary technician (Tr. 24). The claimant alleges inability to work since May 25, 2006, due to brain damage, blood clots, transverse sinus thrombosis, and a stroke, which has caused weakness on the right side of her body (Tr. 266).

## Procedural History

On July 17, 2006, the claimant protectively filed for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-05 (Tr. 109). Her application was denied. ALJ Michael A. Kirkpatrick conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated May 12, 2009 (Tr. 109-21). The Appeals Council remanded that decision for further consideration of: (i) the claimant's obesity in accordance with Soc. Sec. Rul. 02-1p; (ii) the claimant's maximum RFC in accordance with Soc. Sec. Rul. 96-8p; (iii) the opinion of Dr. Kathleen Ward, M.D. in accordance with 20 C.F.R. § 404.1527; and, (iv) whether the claimant met a listing based upon evidence to be obtained from a neurologist (Tr. 124). ALJ

Kirkpatrick held a second administrative hearing and again determined that the claimant was not disabled in a written opinion dated August 16, 2010 (Tr. 10-25). The Appeals Council denied review of that opinion, so the ALJ's August 16, 2010 opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant retained the residual functional capacity (RFC) to perform the full range of medium work, 20 C.F.R. §404.1567(c), *i. e.*, she could lift/carry up to twenty-five pounds frequently, and stand/walk/sit six hours in an eight-hour workday, but could not perform complex, skilled tasks (Tr. 15). The ALJ found that although the claimant could not return to any of her past relevant work, she was nevertheless not disabled because there was other work that she could perform, *i. e.*, warehouse worker, dishwasher and motel housekeeper (Tr. 25).

## Review

The claimant contends that the ALJ erred: (i) by failing to follow the advice of the medical expert; (ii) by failing to perform a proper analysis of her mood disorder; and, (iii) by failing to properly analyze the medical evidence of record. Because the ALJ did fail to properly analyze medical evidence of record, the decision of the Commissioner should be reversed and the case remanded for further analysis.

The claimant was treated for a thrombosis and near total occlusion of her right transverse and sagittal sinuses at Parkland Health & Hospital System from May 25, 2006

through June 3, 2006 (Tr. 362). When she was discharged, her medications consisted of Neurontin, Coumadin, and Lortab (Tr. 364). The claimant subsequently presented to physicians with frequent complaints of severe headaches, with exacerbations occurring four to five times per week (Tr. 861, 897, 950, 965, 1020, 1026, 1033).

State agency physician Dr. R. Hampton Rattan, Ph.D. examined the claimant on March 29, 2007 and April 12, 2007 (Tr. 347-53). She told Dr. Rattan about her stroke and explained that she has moderate to severe memory loss (Tr. 347). The claimant also related that she suffers from frequent, severe headaches and fatigue, and that her headaches occur almost daily (Tr. 347). Dr. Rattan noted that the claimant seemed to have difficulty concentrating during the assessment, and fatigued easily after a couple of hours of testing (Tr. 348). Her full-scale IQ score was found to be an 89, putting her in the low-average to average range (Tr. 350). Dr. Rattan noted that the claimant "had particular difficulty on tasks that involve working memory skills[,]" defined as "the ability to hold information in one's mind temporarily while manipulating that information" (Tr. 35). The results of her trailmaking test, which is a neuropsychological assessment, showed that she was in moderate/severe impairment range (Tr. 351). Dr. Rattan ultimately concluded that the claimant did not have a current mental disorder and that her "testing results suggest some impairment with regard to memory abilities" (Tr. 353).

State agency physician Dr. Kathleen Ward examined the claimant on September 7, 2006 (Tr. 687-89). She told Dr. Ward that she had weakness on the left side of her body,

memory loss, fatigue, extremely bad headaches, and blurry vision as a result of her stroke and brain bleeds (Tr. 687). Dr. Ward noted that the claimant appeared sleepy, tearful, and had a sad affect (Tr. 688). She was unable to complete serial sevens, and completed serial threes through twenty-one "with notable difficulty" (Tr. 689). Dr. Ward noted that the claimant's "intellectual abilities were estimated to be within the average range," but they were "compromised by poor concentration" (Tr. 689). Dr. Ward's diagnostic impression was that the claimant had "concentration problems and difficulties in emotional modulation, consistent with depression" and diagnosed her with mood disorder due to cerebrovascular disease (Tr. 689).

State agency physician Dr. Dennis Brennan, D.O. performed a physical exam of the claimant on December 2, 2006 (Tr. 692-98). Dr. Brennan noted that the claimant's weakness was "overtly present when she becomes tired" and that she reported tiring easily (Tr. 693). The claimant's range of motion in all joints was normal.

State agency physician Dr. Laura Lochner, Ph.D. reviewed the claimant's records and completed a Psychiatric Review Technique (PRT) form in which she opined that the claimant suffered from affective disorders (Tr. 699-716). More specifically, Dr. Lochner found that the claimant's medical records exhibited a disturbance of mood, accompanied by depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking (Tr. 702). As a result, Dr. Lochner found that the claimant had moderate limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace (Tr.

709). Dr. Lochner also completed a Mental Residual Functional Capacity Assessment in which she found that the claimant was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to interact appropriately with the general public (Tr. 713-14).

State agency physician, Dr. Norvin Curtis, Ph.D. also reviewed medical records and completed a PRT form on the claimant. He found that the claimant suffered from a mood disorder causing moderate restrictions in activities of daily living and maintaining concentration, persistence or pace, but only mild limitations in social functioning (Tr. 735). Dr. Curtis also completed a Mental Residual Functional Capacity Assessment in which he found that the claimant was moderately limited in the following functional categories: (i) the ability to understand and remember detailed instructions; (ii) the ability to carry out detailed instructions; (iii) the ability to maintain attention and concentration for extended periods; (iv) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (v) the ability to sustain an ordinary routine without special supervision; and, (vi) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 747-48).

State agency physician Dr. Luther Woodcock, M.D. also reviewed the claimant's medical records and completed a Physical Residual Functional Capacity Assessment on December 18, 2006. He found that the claimant could occasionally lift or carry up to

twenty pounds, frequently lift or carry up to ten pounds, and stand/walk/sit for about six hours in an eight-hour workday (Tr. 718). Dr. Robin Rosenstock, M.D. also completed a physical RFC assessment on the claimant. She opined that the claimant could occasionally lift or carry up to fifty pounds, frequently lift or carry up to twenty-five pounds, and stand/walk/sit for six hours in an eight-hour workday (Tr. 740).

On February 3, 2007, the claimant's treating physician Dr. Stafford Conway at Texoma Neurology completed a Stroke Residual Functional Capacity Questionnaire. He noted that the claimant's symptoms consisted of weakness, pain, headaches, difficulty remembering, and double or blurred vision, and that she suffered from upper extremity weakness and opined that emotional factors contributed to the severity of her symptoms and that the claimant's experiences of pain, fatigue, or other symptoms would constantly interfere with concentration and attention need to complete work tasks (Tr. 1053-54). Dr. Conway also opined that the claimant could sit/stand for twenty minutes at a time and stand/walk for less than two hours in an eight-hour workday (Tr. 1054). Further, Dr. Conway found that the claimant could never lift more than ten pounds, could twist, stoop, crouch only occasionally, and could climb stairs but not ladders (Tr. 1055). Dr. Conway thought that the claimant would be incapable of handling even low stress jobs, and that she would need to be absent from work for treatment or as a result of her impairments more than four days per month (Tr. 1056).

Finally, Dr. George R. Mount, Ph.D. evaluated the claimant on February 19, 2010 (Tr. 1064-68). He administered a neuropsychological screening instrument, on which the

claimant scored well above the general impairment cutoff for both motor and spatial skills and high level skills and cognitive flexibility (Tr. 1065-66). Her IQ was determined to be in the borderline range at 80 (Tr. 1066). The claimant's scores on the Beck Anxiety Inventory revealed moderate anxiety, and her score on the Beck Depression Inventory revealed mild depression (Tr. 1067). Dr. Mount's diagnostic impression was cognitive disorder, NOS, somatization disorder, and borderline intellectual functioning, and he assessed her GAF to be a 47 (Tr. 1067). The claimant also completed a Personality Assessment Inventory, which revealed the following: (i) "an unusual degree of concern about physical functioning and health matters and probable impairment arising from somatic symptoms"; (ii) the claimant was "prone to be somewhat self-critical, uncertain, and indecisive" during stressful times; and (iii) the claimant was somewhat below average in interest in and motivation for psychological treatment (Tr. 1069-78).

Dr. Mount completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on April 9, 2010. He opined that the claimant had marked limitations in: (i) understanding and remembering complex instructions; (ii) carrying out complex instructions; (iii) making judgments on complex work-related decisions; (iv) interacting appropriately with supervisors; (v) interacting appropriately with co-workers; and, (vi) responding appropriately to usual work situations and to changes in a work routine (Tr. 1079-80), and she had moderate limitations in: (i) understanding and remembering simple instructions; (ii) carrying out simple instructions; (iii) making judgments on simple work-

related decisions; and, (iv) interacting appropriately with the public (Tr. 1079-80). Dr. Mount completed a more detailed mental RFC assessment on May 22, 2010. He opined that the claimant had marked limitations in: (i) understanding and remembering detailed instructions; (ii) carrying out detailed instructions; (iii) maintaining attention and concentration for extended periods; (iv) performing activities within a schedule, maintain regular attendance, and being punctual within customary tolerances; (v) sustaining an ordinary routine without special supervision; (vi) working in coordination with or proximity to others without being distracted by them; (vii) completing a normal workday and week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; (viii) interacting appropriately with the general public; (ix) accepting instructions and responding appropriately to criticism from supervisors; (x) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; (xi) responding appropriately to changes in the work setting; (xii) traveling to unfamiliar places or using public transportation; and, (xiii) setting realistic goals or making plans independently of others (Tr. 1083-84), and moderate limitations in a number of functional categories.

Dr. Ronald Duvere, a board-certified neurologist from Austin, Texas, testified as a medical expert at the second administrative hearing regarding the neurological extent of the claimant's impairments. He summarized the medical evidence and opined that the claimant's complaints were secondary to severe depression and not the result of meeting a listing from a neurological standpoint (Tr. 89-90). He testified that the claimant's

fatigue, chronic daily headaches, general malaise, severe concentration problems were likely due to severe depression (Tr. 93). Finally, he opined that the claimant needed to see a psychiatrist and "be evaluated cognitively from the mental status standpoint of psychiatric and get therapy[,]" opining that the claimant may suffer from pain avoidance behavior that may benefit from cognitive rehabilitation (Tr. 94-95).

In evaluating the legal sufficiency of the ALJ's analysis of the claimant's medical evidence, is important to note initially that the ALJ wholly failed to heed the directive of the Appeals Council to properly analyze the opinion of Dr. Kathleen Ward in accordance with the factors set out in 20 C.F.R. § 404.1527. Social Security Ruling 96-6p indicates an ALJ "must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians and psychologists." 1996 WL 374180, at *4. Although an opinion from an agency physician is not entitled to the same deference as any opinion from a treating physician, it must nevertheless be properly evaluated for weight under the factors set forth in 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive . . . [W]e consider all of the following factors in deciding the weight we give to any medical opinion."). The relevant factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v)

whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-01, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001). The ALJ summarized Dr. Ward's opinion but wholly failed to apply *any* of the aforementioned factors in an analysis of the opinion *or* explain the weight to which he was assigning the opinion. This was especially important to do in light of the medical expert's testimony that the claimant's symptoms were likely the result of a psychological process consisting of either severe depression or pain avoidance syndrome, as discussed *infra* (Tr. 93-95). While the ALJ was not bound by any opinion from a state agency physician such as Dr. Ward, he must explain the weight he decides to give such opinion in his decision. *Id*.

Further, it is apparent that the ALJ relied on the opinion of Dr. Rosenstock, who alone opined that the claimant could perform medium work (Tr. 740). But the ALJ never discussed Dr. Rosenstock's opinion *or* explained why he preferred it over the opinion of Dr. Woodcock, who opined that the claimant could perform only light work. *See, e. g., Shubargo v. Barnhart*, 161 Fed. Appx. 748, 754 (10th Cir. 2005) ("[T]he agency requires ALJs to weigh all medical source opinion evidence and explain in their decision why they rely on a particular non-examining agency expert's opinion when opinions are conflicting . . . We conclude that this case must be remanded for the ALJ to consider and discuss Dr. Woodcock's medical opinion and to explain why he rejected it in favor of other non-examining consultative opinions.")[unpublished opinion], *citing* 20 C.F.R. § 404.1527(f);

*Hamlin v. Barnhart*, 365 F.3d 1208, 1223 (10th Cir. 2004); *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

The ALJ also relied heavily on the testimony of the neurological expert Dr. Duvere for his conclusion that the claimant's symptoms were not neurologically-based. But Dr. Duvere also testified: (i) the claimant's symptoms were likely due to severe depression or pain avoidance syndrome, or were otherwise psychologically-based; and, (ii) the claimant needed to undergo cognitive evaluation by a psychiatrist to determine the extent to which the claimant's symptoms were psychologically-based. The ALJ should have discussed and analyzed the significance of this testimony, particularly in light of the other evidence suggesting the claimant had psychological limitations, *e. g.*, the opinions of Dr. Ward and Dr. Mount. But the ALJ apparently ignored this important testimony. "An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007), *citing Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) and *Hamlin*, 365 F.3d at 1219. *See also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."), *citing Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984) ("Th[e] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper.") [citations omitted].

Finally, the ALJ's reasons for assigning little weight to Dr. Mount's very detailed opinions are unsupported by the record. The ALJ claimed that Dr. Mount's separate assessments are conflicting, but the record reveals otherwise. The second assessment simply provides much more detailed information than the first, as the categories in which Dr. Mount found that the claimant had marked limitations in the second simply flesh out the categories in which Dr. Mount found that the claimant had marked limitations in the first. The ALJ also claimed Dr. Mount "admitted that claimant had given inconsistent responses which could affect test results, that claimant may not have answered in a completely forthright manner, and that the nature of her responses might lead the evaluator to form an inaccurate impression based on the style of responding" (Tr. 23). But the clinical report for the Personality Assessment Inventory (PAI), to which the ALJ was referring, simply states that "there appears to have been some inconsistent responses to similar items" on the PAI; the report does not indicate what impact those responses would have had on the results of the inventory (Tr. 1074). Further, with respect to the assertion that the claimant might not have been forthright in her answers, the report indicates that she had an "apparent tendency to repress undesirable characteristics" which suggests that she portrayed herself as functioning better than she actually is (Tr. 1074). Finally, the ALJ ignored that portion of the report stating "there is no evidence to suggest that the respondent was motivated to portray herself in a more negative or pathological light than the clinical picture would warrant" (Tr. 1074). As noted above, an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his

position while ignoring other evidence." *Hardman*, 362 F.3d at 681 (10th Cir. 2004), *citing Switzer*, 742 F.2d at 385-86.

Because the ALJ failed to properly analyze medical evidence of record as outlined above, the decision of the Commissioner should be reversed and the case remanded for further analysis. If such analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner and remand the case for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 13th day of September, 2013.

_____
Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma